**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| ERIC S. MOORE, SR. | ) | |
| BRENDA MOORE, | ) | |
| GEORGE BOYD | ) | |
| DAVID DELAWTER | ) | |
| CALVIN JOHNSON | ) | Civil Action No. 3:14-cv-832 (DJN) |
| JAMES COOKE | ) | |
| RAYMOND HUDSON | ) | |
| ANGELA HUDSON | ) | |
| AARON REED | ) | |
| TAMARA TAYLOR | ) | |
| KATHY BEATTIE | ) | |
| MOHAMMAD MOHASSEL | ) | |
| SHEIDA BORHANI | ) | |
| KERRY LANGFORD | ) | |
| JACOB MUSACCHIA | ) | |
| DARRELL BALLARD | ) | |
| ROBERT LATNEY | ) | |
| GLENN WAINER | ) | |
| MAUDELL SAULS | ) | |
| PAUL ALDRED | ) | |
| PATSY ALDRED | ) | |
| JAMES JEFFERSON | ) | |
| AUDREY GADSON | ) | |
| ERNEST JACKSON | ) | |
| YOLANDA JACKSON | ) | |
| JAMES TURNER | ) | |
| DARLENE TURNER | ) | |
| DAVID DAMIANI | ) | |
| SHARON JOHNSON | ) | |
| ROBERT JONES | ) | |
| CRAIG TURNER | ) | |
| RUTH TURNER | ) | |
| FRANK FOBLE | ) | |
| MICHAEL OTT | ) | |
| DEVORYA WILSON | ) | |
| RONNIE DRAPER | ) | |
| SEAN CRAFT | ) | |
| CHRISTOPHER TOMASEK | ) | |
| ROBERT SMOLINSKI | ) | |
| BEN PARAKUO NAITERRA | ) | |
| MICHAEL MORGAN | ) | |
| MYRA WASHINGTON | ) | |

LAURA WILSON                              )
IDA BEVERLEY                             )
ANTHONY REID                             )
CAROLYN REID                             )
NATKAI AKBAR                             )
SANDRA WATERS-LEVY                       )
VALENTYNA GUDYM                          )
INMER E. CAMPOS-CARRANZA                 )
GLENN T. MACNAUGHTON                     )
SHELAGH PAYNE                            )
CHRISTIAN ANDRADE                        )
CAMILLE BARNETT                          )
JAMES COYNE                              )
PATRICE LONGSHAW                         )
LAWRENCE MAEBA                           )
MONICA ROMERO                            )
DONNIE SHIM                              )
HYUN SONG                                )
FREDDIE THOMPSON                         )
MARK WHIPPLE, *individually and on*      )
*behalf of all other similarly situated* )
*individuals*,                           )
                                         )
                  Plaintiffs,            )
                                         )
v.                                       )
                                         )
LAW OFFICES OF SHAPIRO, BROWN,           )
AND ALT LLP f/k/a LAW OFFICES OF         )
SHAPIRO & BURSON, LLP                    )
                                         )
and                                      )
                                         )
PROFESSIONAL FORECLOSURE                 )
CORPORATION OF VIRGINIA                  )
                                         )
                  Defendants.            )
_____  )

## FIRST AMENDED CLASS COMPLAINT

The Plaintiffs, individually and on behalf of all other similarly situated individuals, state

the following as their First Amended Class Complaint:

## INTRODUCTION

1.     This lawsuit alleges that Defendants engaged in a systemic practice of law-skirting and deception designed for the dual purposes of speeding up consumer foreclosures and ensuring that their business model had the lowest cost structure that they could construct. To accomplish these ends, Shapiro Brown & Alt, LLP ("Shapiro") created the shell entity, Professional Foreclosure Corporation of Virginia ("PFCV"), which falsely claimed to serve as a neutral trustee and who ignored federal and state laws designed to protect consumers.

2.     In reality, PFCV is nothing more than a sham company designed so that Shapiro could be appointed as substitute trustees under the subject deeds of trust and, in turn, remain in sole control of the foreclosure process and charge excess fees under the guise of arm's length transactions. In conducting this sham operation, Shapiro, through its fraudulent alter ego, breached its fiduciary duty by falsely and deceptively charging amounts for title examinations beyond the customary rate and/or for inflating the actual costs actually paid to another third party company— all to the detriment of Virginia consumers. Defendants further breach their duties owed to Virginia consumers with loans guaranteed by the Federal Housing Administration ("FHA") and the Department of Veteran's Affairs ("VA") by conducting the foreclosure of their homes before the conditions precedent to foreclosure were satisfied in the Deeds of Trust; and, by failing to act impartially towards the class members due to, among other things, pricing incentives which caused Defendant to rapidly conduct foreclosures in violation of federal and state laws.

3.     In addition, Plaintiffs further allege that Defendants violated the Fair Debt Collection Practices Act, 15 U.S.C. §§1692 *et seq*. ("FDCPA") by sending Plaintiffs and the putative class members the same form letters that failed to provide the Plaintiffs' notice of their validation rights as required by § 1692g(a)(4), by taking nonjudicial action to dispossess and disable their properties when the property was exempted from foreclosure because the conditions

precedent were unsatisfied, and by falsely and deceptively charging amounts for title examinations beyond the customary rate in violation by § 1692e(2) and by § 1692f(1).

## JURISDICTION

4.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1692k(d). The Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

## PARTIES

5.      Plaintiffs are all natural persons and consumers within the meaning of the FDCPA, as defined at 15 U.S.C. § 1692a(3). Additionally, they all owned properties upon which the Defendants either conducted or attempted to conduct a foreclosure sale. All of Plaintiffs properties were incurred primarily for personal, household purposes making their mortgage debt within the purview of the FDCPA.

6.      Defendant Shapiro, Brown, & Alt, LLP f/k/a Shapiro & Burson, LLP ("Shapiro") is a Virginia law firm, the principal purpose of whose business is the collection of debts. Shapiro is located at 236 Clearfield Avenue, Suite 215, Virginia Beach, Virginia 23462.

7.      Defendant Professional Foreclosure Corporation of Virginia ("PFCV") is a limited liability company, the principal purpose of whose business is the collection of debts and who purported to be a Substitute Trustee under the Plaintiffs' Deeds of Trust. PFCV is located at 236 Clearfield Avenue, Suite 215, Virginia Beach, Virginia 23462.

8.      Defendants regularly collect or attempt to collect debts owed or due or asserted to be owed or due another, and each is a "debt collector" within the meaning of the FDCPA, as defined at 15 U.S.C. § 1692a(6).

## STATEMENT OF FACTS

### FACTS COMMON TO ALL PLAINTIFFS

#### *The Defendants Are Debt Collectors*

9.      Defendant Shapiro is a law firm whose practice is focused on the collection of debts.

10.      Defendant Professional Foreclosure Company of Virginia is a company whose sole purpose is to serve as the substitute trustee for mortgage loans that are referred to Shapiro, for the purpose of collecting delinquent debts and/or conducting foreclosure sales for which it purports to be a substitute trustee. Its principal place of business is located at is located at 236 Clearfield Avenue, Suite 215, Virginia Beach, Virginia 23462.  At all times relevant to this case, Professional Foreclosure Company of Virginia was operating as an alternate voice and alter ego of Shapiro. For all purposes herein they were one and the same and are hereafter referred to collectively as "Defendants."

11.      Defendants advertise that they provide services to mortgage lenders with regard to foreclosures, bankruptcies, evictions, and related matters.[1]

12.      Defendants regularly collect home loan debts, bringing their collection activities within the purview of the FDCPA, at 15 U.S.C. § 1692a(5).

13.      Defendants regularly demand payment of claimed arrearages from consumers and provide reinstatement quotes to consumers, upon request, itemizing amounts they are attempting to collect that often have no basis in reality.

14.      Defendants regularly tell consumers in correspondence that "this is an attempt to collect a debt and any information obtained will be used for that purpose" and/or that "the

---

[1]  *See* http://shapiroandbrown.com/legal_services/ (last visited Jan. 25, 2015).

communication is from a debt collector".  These are disclosures that the FDCPA, at 15 U.S.C. § 1692e(11), requires debt collectors to provide in all written communications (other than a formal pleading) sent "in connection with the collection of any debt" ("the § 1692e(11) disclosure").

15.     Defendants regularly purport to provide verification of debts required by the FDCPA, at 15 U.S.C. § 1692g(b), upon written request from consumers in an effort to convince the consumer to pay the amount demanded.

### Shapiro was Acting as a Trustee Through its Shell Entity, PFCV

16.     Shapiro and its members are not simply a parent holding company of PFCV. Instead, Shapiro and PFCV operate as part of a single business operation.

17.     Upon information and belief, the attorneys and principals of Shapiro created the sham company, PFCV, so that they and their attorneys could be appointed as substitute trustees under the subject deeds of trust in order to have the foreclosure process remain under their sole control and collect the trustee fee as well as attorneys' fees for each foreclosure sale.

18.     This business model was developed so that Shapiro could conduct foreclosures in Virginia as quickly and as cheaply as possible while creating the appearance that the foreclosure was conducted by a neutral trustee, and not by a law firm, who also had an attorney-client relationship with the lender conducting the foreclosure.

19.     Shapiro, acting through its principals and attorneys, provided management and decision-making and operated as the front for contact with the target consumers, loan servicers, lenders, such as PHH Mortgage Corporation, Wells Fargo, and Century 21 and third-party vendors such as LPS. Meanwhile, upon information and belief, Defendant PFCV existed as an employee-less paper entity that acted only on paper as the "substitute trustee" under the deeds of trust.

20.    PFCV does not operate independent of Shapiro. It does not have separate offices, management or a separate business or income. It does not have separate assets.  It does not have separate employees or maintain adequate corporate records or comply with corporate formalities.

21.    Instead, the two companies were interrelated and inseparably operated as a single business operation.

22.    PFCV has little or no income that was not directly derived from Shapiro, and, upon information and belief, does not have any employees other than those who work at Shapiro. PFCV was merely created as a shell entity whose sole purpose was to act as the "substitute trustee" for the mortgage loans that were referred to Shapiro for the purpose of collecting delinquent debts and/or conducting foreclosure sales.

23.    PFCV does not act as a "substitute trustee" for any deeds of trusts except for those referred to Shapiro for debt collection and foreclosure proceedings. In fact, upon information and belief, PFCV will not, as a matter of common practice, agree to serve as trustee for any deeds of trust except those where Shapiro has been retained for debt collection and foreclosure proceedings.

24.    Upon information and belief, PFCV does not have a separate or independent contractual relationship or income stream from any mortgage servicers or note-holders.  Indeed, upon information and belief, all monies allocated to PFCV from the foreclosure sales are ultimately returned to Shapiro and its members, which leaves PFCV undercapitalized.

25.    In all regards in which PFCV is technically involved in a foreclosure process, it is operating as the controlled agent and alter ego of Shapiro.

26.    Shapiro, on the other hand, serves as the frontline company name that is used by Shapiro to deal directly with consumers. Shapiro directs the actions of the personnel who interact

with the consumers, loan servicers, and lenders whose mortgage loans were referred to Shapiro for debt collection or foreclosure proceedings.

27.     Consumers, loan servicers, and lenders never directly interact with PFCV, but instead are directed to contact Shapiro.

28.     The personnel and resources used to accomplish and transact foreclosure are nearly all those maintained in the name of Shapiro. For example, Shapiro mailed the correspondence regarding the alleged foreclosure sale to consumers, purchased newspaper space for the advertisements of the foreclosure sales, and interacted with the loan servicers and lenders.

29.     In addition, all letters mailed to consumers were printed on Shapiro's letterhead, regardless of whether the alleged substitute trustees purportedly sent or signed the letter, and the documents submitted to the various Circuit Courts purportedly by PFCV, the "substitute trustee," were prepared by and had a return address for Shapiro.

### Defendants Fail to Follow the Deeds of Trust for FHA Insured Loans

30.     The Federal Housing Administration ("FHA") was created by Congress as part of the National Housing Act of 1934. The FHA insures loans made by lenders to qualifying homebuyers. The FHA is part of the Department of Housing and Urban Development ("HUD").

31.     In the case of a default, HUD or FHA insures the full value of qualified mortgages, making the loans risk-free for lenders. Because of this, HUD has identified servicing practices that it considers acceptable for mortgages it insures. It is the intent of HUD that "no mortgagee shall commence foreclosure or acquire title to a property until [the servicing] responsibilities . . . have been followed." 24 C.F.R. § 203.500.

32.     HUD's Handbook on Administration of Insured Home Mortgages describes the Mortgagee Collection Attitude "when acquiring the servicing of a mortgage from another

mortgagee, at that time it committed itself to assume the added costs and effort required to service those mortgages in accordance with HUD guidelines should they become delinquent. http://portal.hud.gov/hudportal/HUD?src=/program_offices/administration/hudclips/handbooks/hsgh/4330.1 (p. 89, last viewed Jan. 25, 2015).

33.     All FHA-insured Virginia Deeds of Trust state that "Lender may, except as limited by regulations issued by the Secretary [of Housing and Urban Development], in the case of payment defaults, require immediate payment in full of all sums secured by this Security Instrument . . . ." (emphasis added).

34.     These Deeds of Trust also state: "This Security Instrument does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary [of Housing and Urban Development]."

35.     The regulations require a "face-to-face meeting with the mortgagor, or . . . a reasonable attempt to arrange such a meeting within 30 days after such default and at least 30 days before foreclosure is commenced." 24 C.F.R. § 203.604.

36.     "A reasonable effort to arrange a face-to-face meeting with the mortgagor shall consist at a minimum of one letter sent to the mortgagor certified by the Postal Service as having been dispatched. Such a reasonable effort to arrange a face-to-face meeting shall also include at least one trip to see the mortgagor at the mortgaged property, unless the mortgaged property is more than 200 miles from the mortgagee, its servicer, or a branch office of either, or it is knows that the mortgagor is not residing in the mortgaged property." 24 C.F.R. § 203.604(d).

37.     In *Mathews v. PHH Mortgage Corp.*, 724 S.E.2d 196 (Va. 2012), the Virginia Supreme Court held that the requirements of 24 C.F.R. § 203.604 are incorporated as conditions precedent to a foreclosure sale under the Deed of Trust.

9

38.     As a matter of policy and common practice, PHH Mortgage, Wells Fargo and Century 21 (*i.e.*, Plaintiff's servicers and/or noteholders) made absolutely no effort to arrange a face-to-face meeting with the Plaintiffs prior to their foreclosure or after their default.

39.     No one has complied with these regulatory requirements. No face-to-face meeting was ever attempted with respect to the Plaintiffs with FHA-insured loans.

40.     Because the FHA face-to-face meeting condition precedents have not been attempted, let alone accomplished, the Plaintiffs' Deeds of Trust do not authorize foreclosure, nor do they authorize Defendants to proceed with a foreclose attempt, foreclosure sale, or recordation of a Trustee's Deed.

41.     Defendants are aware that the FHA imposes these additional requirements and whether or not the Plaintiffs' loans were FHA insured. Further, they know, or should know as a trustee of Plaintiffs' deeds of trust, that their mortgage company clients do not comply with this FHA requirement.

42.     However, Defendants either fail to inquire about the satisfactory completion of such a meeting, or simply purposefully ignore its requirement under Plaintiffs' Deeds of Trust, in their attempt to conduct foreclosures at a cheaper cost and with greater speed.

43.     Despite the additional duty imposed on the Defendants by these FHA-insured Deeds of Trust, Defendants systematically breach their fiduciary duty to the Plaintiffs by proceeding with foreclosure when they are not authorized to do so.

### *Likewise, Defendants Fail to Follow the Deeds of Trust for VA Insured Loans*

44.     Similarly, U.S. Department of Veterans Affairs (VA) guaranteed loans are insured against loss if the loan goes into default.

45.     Because of this low-risk status and the government's guarantee, the VA expressly incorporated certain provisions and guidelines into the Deed of Trust that requires noteholders and servicers to abide by a defined set of regulations and procedures as codified under Title 38 of the United States Code and in regulations issued by the VA.

46.     All Virginia Deeds of Trust insured by the VA state that "the provision that the Lender may accelerate payment of the secured indebtedness pursuant to Covenant 18 of the Security Instrument, are hereby amended or negated to the extent necessary to conform such instruments to said Title or Regulations."

47.     These laws and regulations require that the loan servicing program be maintained in such a way as to assure prompt responses to borrowers' inquiries. In fact, 38 C.F.R. 36.4278(g)(iv) specifically provides that if the holder has not evaluated the borrowers' financial circumstances or obtained a repayment plan from the borrower, then a face-to face interview, or reasonable effort to arrange a meeting, is required.

48.     The VA Servicer Guide further provides:

> VA prefers that you first consider loss mitigation options that keep the veteran in their [sic] home. VA requires you to choose the best option for all parties and asks that you consider options as early in the delinquency as possible.
> . . . .
> *When alternatives to foreclosure are not possible*, the loan should be referred for foreclosure as quickly as possible. VA encourages you to continue to pursue loss mitigation options even after initiating the foreclosure process. If a loss mitigation option looks promising, *VA would expect you to postpone the foreclosure action*.

VETERANS BENEFITS ADMIN., U.S. DEP'T OF VETERANS AFFAIRS, VA SERVICER GUIDE 72–73 (Version 1.2 July 2009).

49.     Defendants are aware that the VA imposes these additional requirements and whether the Plaintiffs' loans were VA insured. Further, they know, or should know as a trustee of

Plaintiffs' deeds of trust, that their mortgage company clients do not comply with this VA requirement.

50.     However, Defendants either fail to inquire about the satisfactory completion of such a meeting, or simply purposefully ignore its requirement under Plaintiffs' Deeds of Trust in their attempt to conduct foreclosures at a cheaper cost and with greater speed.

51.     Despite the additional duty imposed on the Defendants by these VA insured Deeds of Trust, Defendants systematically breach their fiduciary duty to these Plaintiffs by proceeding with foreclosure when they are not authorized to do so.

### Defendants Breach its Fiduciary Duty to the Plaintiffs with FHA and VA Loans

52.     Plaintiffs George Boyd, Michael Morgan, Myra Washington, Ida Beverly, Anthony and Carolyn Reid and Laura Wilson (collectively "FHA Plaintiffs") all had mortgage loans that were insured by the Federal Housing Administration and were secured by identical deeds of trust.

53.     FHA Plaintiffs each allege that they were never offered or had their mortgage servicer or investor attempt a face-to-face interview prior to the foreclosure of their homes.

54.     Similarly, Plaintiff Ronnie Draper ("VA Plaintiff") had a loan guaranteed by the Department of Veterans Affairs.

55.     VA Plaintiff's loan was serviced by Loan Care Servicing, who never evaluated Plaintiff for loss mitigation options or made a reasonable effort to arrange a face-to-face meeting.

56.     FHA Plaintiffs loans were serviced by PHH Mortgage, Wells Fargo and Century 21, all of which had branch offices within 200 miles of their homes.

57.     Defendants conducted foreclosure sales even though there was no compliance with the requirements of 24 C.F.R. § 203.604(d) for FHA loans and 38 C.F.R. 36.4278(g)(iv) for VA loans.

58.     As recognized by the Supreme Court of Virginia, the purpose of the face to face interview is not limited to a discussion regarding the "loan delinquency," but rather purpose of the face-to-face meeting is to "reduc[e] the incidence of foreclosure" by providing an environment in which the "mortgagee employee can often determine the cause of the default, obtain financial information[,] establish a repayment schedule[,] and prevent foreclosure by influencing the payment habits of mortgagors." *Squire v. Virginia Hous. Dev. Auth.*, 287 Va. 507, 516-17, 758 S.E.2d 55, 60 (2014).

59.     Neither Plaintiff's servicers, Shapiro, PFCV, nor any other person or entity has complied with the above-alleged regulatory requirements. No face-to-face meeting has been attempted.

60.     Because the FHA and VA face-to-face meeting condition precedents have not been attempted, let alone accomplished, the Plaintiffs' Deeds of Trust do not authorize foreclosure, nor did they authorize Shapiro, through its alter ego PFCV, to proceed with a foreclose attempt, foreclosure sale or recordation of a Deed of Foreclosure.

61.     Therefore, Defendants systematically breached its fiduciary duty to the Plaintiffs' and the putative class members by proceeding with foreclosure when it is not so authorized.

62.     This same conduct also violated § 1692f(6), prohibits debt collectors from using unfair or unconscionable means to collect a debt, *including* "the taking or threatening to take any nonjudicial action to effect dispossession or disablement of property if— (A) there is no present right to possession of the property… or (C) the property is exempt by law from such dispossession or disablement." 15 U.S.C. § 1692(f).

63.     A foreclosure is a "dispossession" or "disablement" of property in any sense of the word and unauthorized nonjudicial foreclosures are prohibited by § 1692f. *Glazer v. Chase Home*

*Fin. LLC*, 704 F.3d 453, 462 (6th Cir. 2013) ("Foreclosure in some states is carried out in just this way—through "nonjudicial action," the result of which is to "effect dispossession" of the secured property."); *Hope v. BSI Fin., Inc.*, No. 5:12-CV-00736-AKK, 2012 WL 5379177, at *4 (N.D. Ala. Oct. 26, 2012) ("Since mortgage foreclosure is essentially termination of a mortgagor's interest and repossession of the mortgaged property, *see* Black's Law Dictionary (9th ed. 2009), the court finds that Plaintiffs sufficiently allege that Defendants attempted to dispossess them of their property [in violation of § 1692f(6)])."

### *Defendants Further Breach Their Fiduciary Duties in Order to Maintain a Positive Rating with Lender Processing Services, Inc.*

64.    Lender Processing Services, Inc. ("LPS") is a company that assembles the information used to foreclose on consumers' properties.[2] LPS's default services revenue, the portion of LPS that includes foreclosure services, quadrupled in annual revenue from $277.8 million in 2006 to more than $1 billion in both 2009 and 2010.[3] Since news about foreclosure fraud was brought to the forefront of the mortgage industry and new regulations and programs have been put in place, such as HAMP, LPS has identified an impact in its revenue.[4]

65.    LPS provides customized technology platforms to mortgage loan servicers depending on the status of the consumers' loan. The first such platform is the Mortgage Servicing Package ("MSP") which assists servicers in administering all aspects of loan servicing, such as payment processing, customer service, investor reporting, etc.

---

[2] Most of the following facts are taken from the Nevada Attorney General's complaint in *Nevada v. Lender Processing Servs., Inc., et al.*, No. A-11-653289-B (Clark Cnty. Dist. Ct. Dec. 15, 2011), which was filed after an extensive investigation into Defendant LPS's business practices.
[3] Mark Basch, *The LPS Solutions*, Fla. Times-Union (Mar. 3, 2011).
[4] Lender Processing Servs. Inc., Annual Report (Form 10-k) 20 (Feb. 29, 2012).

66.     The second technology platform, a web-based platform called LPS Desktop ("Desktop"), is designed to aid mortgage servicers service mortgage loans that are in default. Desktop automates and monitors all tasks involved in the foreclosure process, including monitoring deadlines or LPS-imposed timeframes for foreclosure events and tracking and recording all events and communications taken with respect to the foreclosure of the mortgage loan. In addition, Desktop organizes and stores foreclosure related documents such as notices of default and substitution of trustee documents.

67.     Additionally, Desktop generates and manages invoices sent by its network of foreclosure attorney firms to servicers.

68.     LPS provides its Desktop platform to the vast majority of national mortgage servicers and in exchange the servicers each have agreements with LPS, referred to as a "Default Services Agreement", to manage all bankruptcy and default related loans for those servicers.

69.     Using LPS's MSP and Desktop platform, LPS is able to manage the core aspects of the foreclosure process on behalf of servicers.

70.     When a loan goes into default, it is coded for foreclosure in the servicer's system, at which time Desktop automatically refers the loan for foreclosure to a law firm or trustee company within LPS's network of firms (a "Network Firm").

71.     Upon information and belief, Defendant Shapiro was one of LPS's "Network Firms" and utilized its technology to accept referrals and then proceed to foreclosure.

72.     In order to become a "Network Firm", the firm must enter into a "Network Agreement."

73.     Upon acceptance of the referral, LPS charges the Network Firm a referral fee, which LPS labels an "admin fee". LPS requires that this fee be paid regardless of whether a loan

is actually foreclosed or which stage the loan is removed from the foreclosure pipeline. Therefore, the admin fee does not depend on any administrative work actually completed, but is assessed solely on the fact that LPS referred a loan to the Network Firm.

74.     Desktop then automatically transmits a "referral package", which contains the servicer's information pertaining to the loan, such as copies of the note, screenshots of the unpaid balance, and other details.

75.     LPS constructed its business model so that it became the exclusive means for foreclosure firms to access the millions of dollars in foreclosure related fees held by LPS's servicer-clients. LPS used this powerful position to not only require referral fees from the Network Firms, but also to set its own arbitrary timeline for how long the foreclosure process should take from referral date to sale date.

76.     The Network Firms, like Defendant Shapiro, are thus required to comply with LPS's arbitrary deadlines, sacrificing quality for quantity, or else risk being removed from accessing the majority of the country's top twenty servicers—LPS's servicer-clients.

77.     LPS claims that it acts only as a middleman, providing technology and data processing software during the foreclosure referral process. In actuality, LPS handles core responsibilities which were traditionally the responsibility of loan servicers, including, without limitation, providing direction to foreclosure attorneys about how and when to proceed with foreclosure sales or when to take other actions during the foreclosure process.

78.     Therefore, LPS has assigned itself the responsibility of approving or rejecting requests by Network Firms for extending foreclosure sale dates or other deadlines, as well as responding to a variety of other requests or questions submitted by the Network Firms. Therefore,

the Network Firms, including Defendant Shapiro, actually have very little, if any, contact with their servicer "clients" despite their representation otherwise.

79.     In addition to conducting the servicers' core functions and responsibilities, from at least 2006 through 2010, LPS also executed various foreclosure and mortgage related documents on behalf of its servicer-clients, including, but not limited to, assignments of mortgage, substitution of trustee, lien releases, and other documents needed to establish standing to foreclose.

80.     In fact, LPS has faced numerous lawsuits, as well as investigations, by the U.S. Attorney General and other states' Attorneys General with respect to the mass robo-signing scheme in which it participated.

81.     Additionally, in November 2012, a former LPS executive, Lorraine Brown, pleaded guilty to conspiracy to commit mail and wire fraud for her role in LPS's scheme that saw over a million mortgage-related documents created with false signatures and notarizations.[5]

82.     LPS not only obstructs the line of communication between the servicers and foreclosure firms, but LPS also misrepresents its own role in the foreclosure process by claiming to only provide data and software products when it actually directs the Network Firms through the foreclosure process.

83.     Perhaps LPS's role in directing the Network Firms is best illustrated by the manner in which it rates its Network Firms' performance. LPS's software carefully tracks the speed in which the Network Firm meets LPS's imposed timelines in its system, which is often shorter than investor or Lender imposed timelines. Based on whether the firms complied with LPS timelines, the Network Firms are given an "Attorney Performance Rating" of green, yellow or red. If a

---

[5] Office of Public Affairs, Dep't of Justice, http://www.justice.gov/opa/pr/2012/November/12-crm-1400.html (Nov. 20, 2012).

Network Firm, including Defendant Shapiro, remains in the "red" for too long, LPS will cease to refer cases to that Network Firm, instead referring the cases to Network Firms who are able to conduct the foreclosures faster.

84.     Time is the only component of the Attorney Performance Rating. The rating does not take into account the quality with which the foreclosures are conducted.

85.     Upon information and belief, LPS referred the Plaintiffs' mortgage loans to Defendants through LPS's software platforms, including, without limitation, MPS and/or Desktop.

86.     Additionally, upon information and belief, Shapiro is one of LPS's Network Firms and utilizes LPS technology, namely Desktop, during its foreclosures.

87.      Defendants conducted foreclosures in this manner so that the firm would maintain a positive "Attorney Performance Rating" in LPS's system and therefore continue to receive foreclosures referrals from LPS.

88.     Defendant's "Attorney Performance Rating" on LPS was a major incentive for Defendants to conduct foreclosures at the quickest possible speed without regard for any fiduciary duties they owed to the borrower as "substitute trustees" under the subject Deeds of Trust.

89.     Defendants were wholly unprepared to act as trustees as they were incentivized to foreclose regardless of whether a foreclosure sale should actually proceed. They typically did not have the notes, did not know whether loss mitigation has been attempted, did not know whether the prerequisites to foreclosure—especially for FHA or VA loans—had been met, etc., all of which could have caused the foreclosure timelines to be extended, resulted in foreclosure sale cancellations, and caused their "Attorney Performance Rating" to change to "red", ultimately causing them to lose any future foreclosure referrals.

90.     Additionally, the pricing scheme under which Defendants were paid further incentivized them to conduct foreclosures sales as quickly as possible without regard to the requirements of the law, rather than working with the consumer debtor to help them remain in their homes, despite the fact that it is actually more beneficial to the investors that loss mitigation is pursued rather than foreclosure.

91.     This additional compensation, plus the increased cost of complying with the law, motivated these Defendants' deceptive conduct, which can only be characterized as pecuniary— not as perfectly fair and impartial.

92.     In fact PFCV, with none of its own employees, would often just auction off the property and collect the maximum trustee fee as prescribed under the Virginia Code.

93.     In sum, Defendants breached their duty of impartiality by engaging in a systematic practice of law-skirting and deception motivated by pecuniary gain to the significant detriment of those for whom they acted as fiduciaries.

94.     Defendants' desire to maintain a green performance rating also lead them to falsify documents. For example, a whistleblower complaint made by a former employee of Shapiro & Burson, Jose Portillo contained various robo-signing allegations, which caused an investigation into Shapiro & Burson's foreclosure proceedings by the Prince George's County State Attorney's office in Maryland. In his complaint, Mr. Portillo described a widespread office policy of improper notarization and employees signing on behalf of other employees.

95.     Once the mortgage loans are referred to Defendants, they create a "Substitution of Trustee" document, which they claim gives them the authority to conduct a foreclosure sale under the subject deeds of trust.

96.     The Substitution of Trustee document is false and improper in several respects.

97.     In fact, a large majority of the substitution of trustees documents are created and signed by Defendant Shapiro and/or its employees as "attorney in fact" for the "noteholder." Therefore, Defendants essentially attempt to appoint themselves as substitute trustees.

98.     Plaintiffs' counsel have reviewed numerous substitution of trustee documents prepared and signed by Defendants' employees, and upon information and belief, certain individuals who either signed these statements or purported to notarize them did not do so personally.

99.     In these instances, the date on the notary block is often filled out with a different pen or marker and/or with much different handwriting then the rest of the writing, presumably by a different individual employed by the Defendants, and presumably so the dates of the signature blocks match.

100.     These documents are a legal nullity and do not actually authorize Defendant PFCV to act as substitute trustee.

101.     Defendant Shapiro used false signatures or falsely created documents because doing so allowed the Defendants to process foreclosures at a much higher rate, thereby ensuring that Defendant Shapiro maintained a positive "Attorney Performance Rating" and continued to receive foreclosure referrals through LPS's system. Without the need to send the document to the actual entity or persons with the authority to appoint a substitute trustee, Defendants were able to speed up the foreclosure process by days or even weeks. LPS and the loan servicers were well aware that Defendant Shapiro was using falsified and misleading documents, and turned a blind eye to the improper signatures for the sake of speeding up the foreclosure process, increasing their bottom lines, and ultimately increasing their profitability.

102.     Upon information and belief, the individuals who sign these sworn statements on the substitution of trustee document purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, do not have such personal knowledge or such legal standing.  Upon information and belief, certain individuals who either signed these statements or purported to notarize them did not do so personally.

103.     Upon information and belief, there is no agreement with the loan servicers or noteholders and Defendant PFCV to act as substitute trustee because it is under the complete control and alter ego of Shapiro as discussed above.

104.     Under the guise of PFCV, Shapiro purports to act as a neutral and impartial trustee under thousands of deeds of trust, including the Plaintiffs' Deeds of Trust. However, as more fully described in this lawsuit, Shapiro engages in a systemic practice of law-skirting and deception in violation of its duty to act as a neutral and impartial trustee in order to increase the compensation it received from beneficiaries, and to ensure that Shapiro would continue to receive referrals from mortgage servicers, noteholders and other beneficiaries. These incentives caused Shapiro to develop a foreclosure system in conflict with its duty to act with perfect fairness and impartiality to the named Plaintiffs and the putative class members.

### Defendants Attempt to Collect a Debt from Plaintiffs

105.     Within one year of filing the original complaints in this matter, Defendants mailed correspondence to Plaintiffs Eric S. Moore, Sr., Brenda Moore, George Boyd, David Delawter, Calvin Johnson, James Cooke, Raymond Hudson, Angela Hudson, Aaron Reed, Tamara Taylor, Glenn Wainer, James Turner, Darlene Turner, David Damiani, Sharon Johnson, Robert Jones, Craig Turner, Ruth Turner, Ronnie Draper, Sean Craft, Christopher Tomasek, Robert Smolinski, Ben Parakuo Naiterra, Michael Morgan, Ida Beverly, Anthony Reid, Carolyn Reid, Natkai Akbar,

Sandra Waters-Levy, Valentyna Gudym, Inmer Campos-Carranza, Glenn T. MacNaughton, Shelagh Payne, Christian Andrade, Camille Barnett, James Coyne, Patrice Longshaw, Lawrence Maeba, Monica Romero, Donnie Shim, Hyun Song, Freddie Thompson and Mark Whipple (collectively "FDCPA Plaintiffs") attempting to make the debt validation disclosures required by the FDCPA at 15 U.S.C. § 1692g.

106.    Upon information and belief, this is a form notice mailed to all consumers in Virginia when Defendants attempts to make the debt validation disclosure for a delinquent mortgage debt.

107.    Exhibit 1 is a true copy of the letter mailed to Plaintiff Sandra Waters- Levy, which all of the FDCPA Plaintiffs received in substantially similar format which states in relevant part as follows:

NOTICE REQUIRED BY THE FAIR DEBT COLLECTION PRACTICES ACT
15 U.S.C. Section 1692, *et. seq.*

The Law firm of Shapiro & Burson, LLP and Professional Foreclosure Corporation of Virginia, a Virginia Corporation have been retained to initiate foreclosure proceedings….The following information is provided to you as required by the Federal Fair Debt Collections Practices Act:

…

3.    The Fair Debt Collection Practices Act entitles you to dispute the debt, or any portion thereof, within thirty (30) days of your receipt of this letter. The law also entitles you to request that we provide you the name of the original creditor if the original creditor is different from the current creditor, our client <u>Green Tree Servicing, LLC</u>. If you choose to dispute the debt, or any portion thereof, or if you choose to request the name of the original creditor, you must notify us within thirty (30) days of the date you receive this letter. Unless you dispute the validity of the debt within thirty (30) days after receipt of this notice, the debt will be assumed to be valid by this firm.

4.    If you notify us within thirty (30) days of the date you receive this letter that you are disputing the debt, or any portion thereof, or if you notify us within thirty (30) days of the date you receive this letter that you want to know the name of the original creditor if that creditor is different from, our client, <u>Green Tree Servicing,</u>

LLC, then we will obtain and mail to you verification of the debt and/or the name and address of the original creditor.

5.     The Fair Debt Collection Practices Act does not require that we wait until thirty (30) days from the date that you receive this letter before we initiate foreclosure proceedings to foreclose on your mortgage. In the event we do initiate foreclosure proceedings to foreclose on your mortgage, within thirty (30) days from the date you receive this letter, you still retain the right to dispute the debt, or any portion thereof, and you also retain the right to request the name of the original creditor if the original creditor is different from the current creditor, Green Tree Servicing, LLC.

108.    The notice by which the Defendants purport to make the required disclosures is defective in various respects.

109.    In particular, Defendants' purported thirty day validation notice disclosure omits any reference to the in writing requirement. *DeCapri v. Law Offices of Shaprio Brown & Alt, LLP*, 2014 WL 4699591, at *7 (E.D. Va. Sept. 19, 2014) ("Where a dunning letter fails to advise that the debtor's request under § 1692g(a)(4) must be in writing, the least sophisticated consumer is not merely uncertain of her rights under the statute, she is completely unaware of them. As far as this Court can tell, those courts that have confronted the issue have held that a debt collector's failure to include the 'in writing' requirement violates subsection (a)(4) of section 1692g.") (emphasis added) (internal citations omitted).

110.    Paragraph 4 of Defendants' purported thirty day validation notice omits any reference to the in writing requirement.

111.    Additionally, as to Plaintiff Natkai Akbar, Defendants' initial correspondence did not indicate any creditor to whom the debt was owed and instead used legal terminology of "Plaintiff" where the identity of her creditor should have been causing great confusion and distress to Plaintiff Akbar.

**Defendants Make False Statements in the Attempted Foreclosure**

23

112.    Upon information and belief, all of the FDCPA Plaintiffs who disputed the debt to Defendants received reinstatement quotes or payoff quotes.

113.    Each time Defendants provided the reinstatement quotes or payoff quotes, it sought to collect amount incidental to the principal obligation, which were not permitted by the loan documents or by law.

114.    It does so as to Plaintiffs Shelagh Payne, Glenn MacNaughton and Valentyna Gudym (hereafter "Reinstatement Plaintiffs.").

115.    All of these Reinstatement Plaintiffs received correspondences in substantially the same format as below.

116.    As an example, Plaintiff Shelagh Payne received reinstatement figure correspondence that stated:

> We represent America's Servicing Company. Pursuant to your request, the below amount represents the reinstatement figures for the loan through August 17, 2011:

| | |
|---|---|
| Total Payments Due: <br> 6 payments at $4,028.36 per payment <br> (March 1, 2011 through June 1, 2011) | $24,170.16 |
| Other Fees: | $80.00 |
| Corporate Advances: | $130.00 |
| Accrued Late Charges: | $942.60 |
| Attorney Fees as of August 17, 2011: | $360.00 |
| Foreclosure Costs as of August 17, 2011: | $465.48* |

|  |  |
|---|---|
| *BREAKDOWN OF Foreclosure Costs: | |
| *RECORDING COSTS | $21.00 |
| *TITLE COSTS | $375.00 |
| *Certified Mail Costs | $69.48 |

| | |
|---|---|
| **TOTAL as of AUGUST 17, 2011** | **$26,148.24** |

117.    The next day Plaintiff Payne received   August 18, 2011 payoff figures correspondence that stated:

> We represent America's Servicing Company. Pursuant to your request, the below amount represents the payoff figures for the loan through August 18, 2011:

| | |
|---|---|
| Total Payments Due: | $458,791.88 |
| Total Interest Due: | $17,147.33 |
| Escrow Advances: | $496.42 |
| Property Inspections: | $80.00 |
| BPO/Appraisal: | $2,137.00 |
| Recoverable Balance: | $150.00 |
| Accrued Late Charges: | $785.50 |
| Attorney Fees as of August 17, 2011: | $360.00 |
| Foreclosure Costs as of August 17, 2011: | $415.48* |

*BREAKDOWN OF Foreclosure Costs:

| | |
|---|---|
| *RECORDING COSTS | $21.00 |
| *TITLE COSTS | $325.00 |
| *Certified Mail Costs | $69.48 |

**TOTAL as of AUGUST 18, 2011          $480,363.61**

118.    These correspondences demonstrate that one or more of the Defendants' statements about the amounts due are false because it changed the amount owed for items, such as title costs.

119.    Accordingly, Defendants falsely state the amount of the debt and attempted to collect amounts not permitted by law or contract in violation of the FDCPA.

### *Defendants Further Charge Excess Amounts for Title Searches*

120.    As part of the foreclosure process, Defendants purportedly runs title searches on each of the Plaintiffs' property.

121.    For example, as reflected by the reinstatement quote and payoff statement above, Defendants charged Plaintiff Payne $375.00 or $325.00 for a title examination.

122.    This amount is far in excess of the reasonable and customary fee for such services.

123.    Based on Plaintiffs' counsels' research, the reasonable and customary fee for this title examination should have at that time been no more than $100.00, which would be a high rate for such services.

124.    However, Defendants charges the maximum amount allowed by servicing guidelines without regard for the actual cost of the title search because Defendants and/or its members have or had an ownership interest in First Financial Title Agency of Virginia, Inc.— another sham company established by Defendants for the purposes of exploiting consumers while creating the appearance that the overpriced title examinations were market rate.

125.    Accordingly, Defendants falsely and deceptively demanded a $375.00 or $325.00 payment from the FDCPA Plaintiffs for a purported title examination even though this was almost 300% more than the market rate. Moreover, after the foreclosure sale occurred, these excess fees were passed on to Plaintiffs who lost their homes—increasing any deficiency balance or resulting in lost equity.

126.    Such conduct amounts to a breach of Defendants' fiduciary duty and is a violation of the FDCPA.

127.    Upon information and belief, Defendants' unlawful and deceptive practices as explained above were uniform throughout the past two years prior to the filing of the original Complaints.

128.    Accordingly, all named Plaintiffs assert fiduciary duty claims against Defendant for the excess title charges.

***Defendants Violated § 1692f as to Plaintiffs Gudym, Campos-Carranza, Mohassel, & Borhani***

129.     Defendants also violated § 1692f as to Plaintiff Valentyna Gudym by threatening in correspondence to take nonjudicial action to effect the dispossession of her property when there was no present right to possession of the property because she was current on her loan and paying in accordance with a loan modification.

130.     Similarly, Defendants violated § 1692f as to Plaintiff Inmer Campos-Carranza because it threatened and took nonjudicial action to effect the dispossession of his property when the conditions precedent to foreclosure in his deed of trust had not been followed. His lender breached his note in an effort to accelerate his loan which resulted in the wrongful foreclosure of his home as explained at length in Mr. Campos-Carranza's lawsuit styled *Campos-Carranza v. Federal Home Loan Mortgage Corporation*, Case No. 4:12-cv-94 (E.D. Va. 2012). Plaintiff Campos-Carranza incorporates his allegations in that lawsuit against Defendants regarding the wrongful foreclosure of his home.

131.     Defendants also violated § 1692f as to Plaintiff Mohammad Mohassel by taking nonjudicial action to foreclose on his home when there was no present right to possession. Even though the sale was rescinded (because it was unlawful), Plaintiff Mohammad Mohassel suffered actual damages as a result of Defendants violation of § 1692f.

132.     Defendants also violated § 1692f as to Plaintiff Sheida Borhani by taking nonjudicial action to foreclose on his home when there was no present right to possession. Even though the sale was rescinded (because it was unlawful), Plaintiff Sheida Borhani suffered actual damages as a result of Defendants violation of § 1692f.

**COUNT ONE:**
**BREACH OF FIDUCIARY DUTIES**
**(ALL PLAINTIFFS)**
**CLASS CLAIM**

138.     Plaintiffs restates each of the allegations in the preceding paragraphs as if set forth at length herein.

139.     This matter is also brought a class action for a "Title Fee" class, initially defined as follows:

> All natural persons (i.) located in the Commonwealth of Virginia (ii.) who had a mortgage loan which was referred to Defendants for collection within two years prior to the filing of the original Complaint; (iii.) and for whom Defendants either demanded or assessed charges in excess of the reasonable and customary rate for title examination or for whom Defendants' records show that First Financial Title Agency of Virginia, Inc. was paid more than $100.00 for a title examination.
>
> All Plaintiffs are members of the proposed Title Fee Class.

140.     This matter is also brought as a subclass for a "FHA Foreclosure Class" class, initially defined as follows:

> All natural persons (a.) located in the Commonwealth of Virginia (b.) who had a mortgage loan which was insured by the Federal Housing Administration; (c.) and who suffered a foreclosure conducted by Shapiro and/or PFCV within two years prior to the filing of the Complaint (d.) when PHH Mortgage Corporation, Wells Fargo, and/or Century 21 were the servicer or beneficiary of the loan.
>
> FHA Plaintiffs are members of the proposed FHA Foreclosure Class.

141.     This matter is also brought as a subclass for a "VA Foreclosure Class" class, initially defined as follows:

> All natural persons (a.) located in the Commonwealth of Virginia (b.) who had a mortgage loan which was insured by the Department of Veterans Affairs; (c.) and who suffered a foreclosure conducted by Shapiro and/or PFCV within two years prior to the filing of the Complaint (d.) when Loan Care Servicing was the servicer or beneficiary of the loan.

VA Plaintiff is a member of the proposed VA Foreclosure Class.

142.    Upon information and belief the class is so numerous that joinder of all members is impractical. In addition, Plaintiffs believe that the class is so numerous that joinder of all members is impractical.

143.    There are questions of law and fact common to the class, which common issues predominate over any issues involving only individual class members.  For example, and without limitation: (a.) whether Defendants charged the Plaintiffs and putative class members excess amounts for title fees; (b.) whether the imposition of excess fees for title exams constitutes a breach of Defendants' fiduciary duties; (c.) whether the FHA Plaintiffs' noteholders or servicers attempted to make a visit to class members' properties prior to foreclosure; (d.) whether the Defendants breached their fiduciary duties by conducting foreclosure sales when the conditions precedent to foreclosure were unsatisfied; (e.) whether Defendants breached their fiduciary duty of impartiality; and (f.) what remedies are available for such a breach of fiduciary duty.

144.    Plaintiffs' claims are typical of those of the class members.  All are based on the same facts and legal theories. The violations alleged are the same and the class claims will rise and fall entirely based upon whether or not Plaintiffs' claims rise or fall.

145.    The Plaintiffs will fairly and adequately protect the interests of the class.  Plaintiffs have retained counsel experienced in handling actions involving unlawful practices against consumers and class actions.  Neither Plaintiffs nor their counsel have any interests that might cause them not to vigorously pursue this action. Plaintiffs are aware of their responsibilities to the putative classes and have accepted such responsibilities.

146.    Certification of a class under Rule 23(b)(1) of the Federal Rules of Civil Procedure is proper.  Prosecuting separate actions by or against individual class members would create a risk

of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

147.    Certification of a class under Rule 23(b)(2) of the Federal Rules of Civil Procedure is appropriate in that Defendants have acted on grounds generally applicable to the class thereby making appropriate declaratory relief with respect to the class as a whole.

148.    Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

a.    As alleged above, the questions of law or fact common to the members of the classes predominate over any questions affecting an individual member.  Each of the common facts and legal questions in the case overwhelm the more modest individual damages issues. Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

b.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Consumer claims generally are ideal for class treatment as they involve many, if not most, consumers who are otherwise disempowered and unable to afford and bring such claims individually. Further, most consumers whom suffered a foreclosure at the hands of Defendants would likely be unaware of their rights under the law, or who they could find to represent them in federal litigation. Additionally, individual litigation of the uniform issues in this case would be a waste of judicial resources. The issues at the core of this case are classwide and should be resolved at one time. One win for one consumer would set the law as for every similarly situated consumer.

149.    Plaintiff and the putative class allege a cause of action for Defendants breach of fiduciary duties under the subject Deed of Trust.  To the extent that they were properly appointed as trustees, Shapiro through its alter ego, PFCV, were the fiduciaries for both the Plaintiff and the putative class and the noteholder, creditor, beneficiary and/or investor, thus owing fiduciary duties to both parties.

150.    Defendants breached their fiduciary duties to Plaintiffs and the putative class members by falsely and deceptively charging amounts for title examinations beyond the customary rate and/or for inflating costs actually paid when, in reality, the excess charges were getting kicked back to Defendants' members. Defendants further breached their fiduciary duties to the FHA Plaintiffs and the VA Plaintiffs by conducting foreclosures of their homes without the consumer receiving any face-to-face interview. Defendants breached their fiduciary duties by failing to act impartially towards the Plaintiffs and putative class members due to pricing incentives and forced compliance with unreasonable timelines. Based on the pricing incentives and forced timelines, Defendants acted for their own pecuniary gain so that they remained in LPS's referral network, including Defendants' policy of conducting foreclosures of FHA loans without the consumer receiving any face to face interview.

151.    As a result, Plaintiffs and the putative class suffered injury and are entitled to recover actual damages and costs against Defendants.

**COUNT TWO:**
**VIOLATION OF 15 U.S.C. § 1692g**

**CLASS CLAIM**
**(FDCPA Plaintiffs)**

152.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

153.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a class initially defined as follows:

> All natural persons residing in the Commonwealth of Virginia at the time that they received correspondence from the Defendant: (i) in the form of Exhibit 1; (ii) in an attempt to collect a debt serviced by the Defendants, (iii) that was incurred primarily for personal, household or family purposes (iv) at a time that Defendants' records stated that the subject debt was in default, (v) during the one year period prior to the filing of the original Complaints in this matter.

> FDCPA Plaintiffs are members of this class.

154.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants and the class members may be notified of the pendency of this action by published and/or mailed notice.

155.    **Predominance of Common Questions of Law and Fact. FED. R. CIV. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members.   These questions predominate over the questions affecting only individual class members. The principal issues are: (a.) Whether Defendants are a debt collectors; (b) whether Defendants' correspondence in the form of Exhibit 1 violated § 1692g(a)(4) by omitting the in writing requirement; and (c.) if Defendants violated the FDCPA, what is the appropriate amount of damages?

156.    **Typicality. FED. R. CIV. P. 23(a)(3)** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

157.    **Adequacy of Representation. FED. R. CIV. P. 23(a)(4)** Plaintiffs are adequate representatives of the putative class, because their interests coincide with, and are not antagonistic

to, the interests of the members of the Class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the Class. Neither Plaintiffs nor their counsel have any interests which might cause him not to vigorously pursue this action.

158.   **Superiority.** FED. R. CIV. P. 23(b)(3) Questions of law and fact common to the Class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct.  By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

159.   **Issue-Only Certification.** Plaintiffs may seek issue-only certification on 2 discrete issues relating to liability and statutory damages—that is, (A) whether Defendants' form letter violated § 1692g(a)(4); and then (B) what is the appropriate amount of statutory damages to award per class member. Adjudication of these issues will significantly advance the resolution of the underlying case, thus promoting judicial economy and efficiency.

160.   Defendant violated § 1692g(a)(4) by omitting the in writing requirement.

161.    As a result of the violation, the FDCPA Plaintiffs and the putative class members are therefore entitled to statutory damages against Defendants, as well as their reasonable attorneys' fees and costs, pursuant to 15 U.S.C. § 1692k.

**COUNT THREE:**
**VIOLATION OF 15 U.S.C. § 1692f(6)**

**CLASS CLAIM**
**(FHA Plaintiffs and VA Plaintiff)**

162.    The FHA Plaintiffs and the VA Plaintiff repeat and re-allege every allegation above as if set forth herein in full.

163.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the FHA Plaintiffs and the VA Plaintiff bring this action for themselves and on behalf of a class initially defined as follows:

> All natural persons residing in the Commonwealth of Virginia: (i) who had a mortgage loan which was insured by the Federal Housing Administration or the Department of Veteran Affairs; (ii) who suffered a foreclosure from the Defendant; (iii) for a mortgage loan that was incurred primarily for personal, household or family purposes (iv) during the one year period prior to the filing of the Complaint in this matter; (v) when PHH Mortgage Corporation, Wells Fargo, Century 21 and/or Loan Care Servicing were the servicer or beneficiary of the loan.

164.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendant and the class members may be notified of the pendency of this action by published and/or mailed notice.

165.    **Predominance of Common Questions of Law and Fact. FED. R. CIV. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members.   These questions

34

predominate over the questions affecting only individual class members. The principal issues are: (a.) Whether Defendants are debt collectors; (b) whether Defendants violated the FDCPA by conducting foreclosures when there was no present right to possession of Plaintiffs and the class members' properties because the requirements of 24 C.F.R. § 203.604 were not satisfied; (c.) whether the Defendants' foreclosure of Plaintiff and the class members' properties constitutes taking nonjudicial action when there is no present right to possession; (d.) What is the appropriate amount of actual and statutory damages?

166.    **Typicality.** FED. R. CIV. P. 23(a)(3) Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

167.    **Adequacy of Representation.** FED. R. CIV. P. 23(a)(4) Plaintiffs are adequate representatives of the putative class, because their interests coincide with, and are not antagonistic to, the interests of the members of the Class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the Class. Neither Plaintiffs nor their counsel have any interests which might cause him not to vigorously pursue this action.

168.    **Superiority.** FED. R. CIV. P. 23(b)(3) Questions of law and fact common to the Class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class themselves could

afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendant's conduct.  By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

169.  **Issue-Only Certification.** Plaintiff may seek issue-only certification on 3 discrete issues relating to liability and statutory damages—that is, (a.) whether Defendants violated § 1692f(6) by foreclosing on Plaintiffs' properties when there was no present right to possession because the requirements of 24 C.F.R. § 203.604 were not satisfied; and (C) what is the appropriate amount of statutory damages to award per class member. Adjudication of these issues will significantly advance the resolution of the underlying case, thus promoting judicial economy and efficiency.

170.  Defendants violated § 1692f(6) by threatening, and ultimately taking, nonjudicial action to effect the disposition of the FHA Plaintiffs and VA Plaintiff's properties when there was no present right to possession.

171.  Plaintiff and the putative class members are therefore entitled to actual damages, statutory damages against Defendants, as well as their reasonable attorney's fees and costs, pursuant to 15 U.S.C. § 1692k.

### COUNT FOUR:
### VIOLATION OF 15 U.S.C. § 1692e(2) & 1692f(1)

### CLASS CLAIM

172.  Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

173.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a class initially defined as follows:

> All natural persons (i.) located in the Commonwealth of Virginia (ii.) who had a mortgage loan which was referred to Defendants for collection within a year prior to the filing of the Complaint; (iii.) and for whom Defendants' records show it either demanded or assessed fees in excess of the reasonable and customary rate for title examination or title update.

174.    Reinstatement Plaintiffs further bring this claim for themselves and on behalf of a subclass initially defined as follows:

> Sub-class:  All natural persons (i.) located in the Commonwealth of Virginia (ii.) who had a mortgage loan which was referred to Defendants for collection within a year prior to the filing of the Complaint; (iii.) and for whom Defendants' records show that it mailed a consumer a reinstatement or payoff letter; (iv) where the amount of title charges exceeded $100.00 or was less than amount previously demanded by Defendants.

175.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendant and the class members may be notified of the pendency of this action by published and/or mailed notice.

176.    **Predominance of Common Questions of Law and Fact. FED. R. CIV. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues are: (a.) Whether Defendants are debt collectors; (b.) whether Defendants charges for title examinations exceeded reasonable and customary rates in violation of the FDCPA?; (c.) whether Defendants obtained title

examinations and updates from other companies for a cheaper amount than the amount charged to consumers; and (d.) what is the appropriate amount of damages?

177. **Typicality.** FED. R. CIV. P. 23(a)(3) Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

178. **Adequacy of Representation.** FED. R. CIV. P. 23(a)(4) Plaintiffs are adequate representatives of the putative class, because their interests coincide with, and are not antagonistic to, the interests of the members of the Class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the Class. Neither Plaintiffs nor their counsel have any interests which might cause him not to vigorously pursue this action.

179. **Superiority.** FED. R. CIV. P. 23(b)(3) Questions of law and fact common to the Class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendant's conduct. By contrast, the class action device will result in

substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

180.    **Issue-Only Certification.** Plaintiff may seek issue-only certification on 3 discrete issues relating to liability and statutory damages—that is, (a.) whether Defendants' conduct of falsely and deceptively charging amounts for title searches beyond the customary rate violated the FDCPA; (b.) whether Defendant's inflation of the actual cost of the title search violated the FDCPA; and then (c.) what is the appropriate amount of statutory damages to award per class member. Adjudication of these issues will significantly advance the resolution of the underlying case, thus promoting judicial economy and efficiency.

181.    Defendant violated § 1692e(2)(A) and § 1692f by falsely and deceptively charging amounts for title examinations beyond the customary rate for inflating the actual costs actually paid and/or by falsely and deceptively representing different amounts were incurred when providing consumers with reinstatement and payoff quotes.

182.    Plaintiff and the putative class members are therefore entitled to actual damages, statutory damages against Defendants, as well as their reasonable attorney's fees and costs, pursuant to 15 U.S.C. § 1692k.

## COUNT FIVE:
## VIOLATION OF 15 U.S.C. § 1692f(6)

### INDIVIDUAL CLAIM
### (Gudym, Campos-Carranza, Mohassel, Borhani)

183.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

184.    Defendants violated § 1692f(6) as to these individual Plaintiffs through its conduct, including but not limited to: its threats to foreclose on Ms. Gudym when she was current on her

mortgage payments and by foreclosing on Plaintiffs Campos-Carranza, Mohassel, and Borhani's properties when there was no present right to possession.

185.    As a result, Plaintiffs Gudym, Campos-Carranza, Mohassel and Borhani are entitled to recover statutory damages, actual damages, reasonable attorneys' fees, and costs against Defendants pursuant to 15 U.S.C. § 1692k.

## COUNT SIX:
## VIOLATION OF 15 U.S.C. § 1692g

### INDIVIDUAL CLAIM
### (Akbar)

186.    Plaintiff Akbar repeats and re-alleges every allegation above as if set forth herein in full.

187.    Defendant violated § 1692g of the FDCPA by sending her an initial communication which failed to disclose the creditor to whom the debt was owed.

188.    As a result, Plaintiff Akbar is entitled to recover statutory damages, actual damages, reasonable attorneys' fees, and costs against Defendants pursuant to  15 U.S.C. § 1692g.

WHEREFORE, Plaintiffs move for class certification and for judgment against the Defendants as alleged for actual and statutory damages, for injunctive and declaratory relief, and for attorney's fees and costs, and such other specific or general relief the Court does find just and appropriate.

**A TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,
**Plaintiffs**

By Counsel

_____/s/_____
Kristi Cahoon Kelly, Esq. (VSB #72791)

40

Andrew J. Guzzo, Esq. (VSB #82170)
Kelly & Crandall PLC
4084 University Drive, Suite 202A
Fairfax, VA 22030
703-424-7572
Fax: 703-591-0167
Email: kkelly@kellyandcrandall.com
Email: aguzzo@kellyandcrandall.com

Matthew J. Erausquin, VSB#65434
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
(703) 273-7770
(888) 892-3513 (Fax)
Email: matt@clalegal.com

Leonard Anthony Bennett, Esq. (VSB #37523)
Susan Mary Rotkis, Esq. (VSB #40693)
Consumer Litigation Associates
763 J Clyde Morris Boulevard, Suite 1A
Newport News, VA 23601
757-930-3660
Fax: 757-930-3662
Email: lenbennett@clalegal.com
Email: srotkis@clalegal.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 9th day of February, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Bizhan Beiramee, Esquire
McGinnis Wutscher Beiramee LLP
7508 Wisconsin Ave., 2nd floor
Bethesda, MD 20814
bbeiramee@beiramee.com

John C. Lynch, Esquire
Megan E. Burns, Esquire
Troutman Sanders LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, VA 23462
john.lynch@troutmansanders.com
megan.burns@troutmansanders.com

*Counsel for Defendant*


_____/s/_____
Kristi Cahoon Kelly, VSB #72791
Kelly & Crandall, PLC
4084 University Drive, Suite 202A
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167Facsimile
kkelly@kellyandcrandall.com